David A. Ward
   New Jersey Bar No. 042381996
   dward@klugerhealey.com
**KLUGER HEALEY, LLC**
521 Newman Springs Road, Suite 23
Lincroft, NJ  07738
Telephone:  (973) 307-0800
Facsimile: (888) 635-1653


M. Scott Fuller
   Texas Bar No. 24036607
   Georgia Bar No. 100968
   sfuller@ghiplaw.com
Randall Garteiser
   Texas Bar No. 24038912
   California Bar No. 239829
   rgarteiser@ghiplaw.com
**GARTEISER HONEA, PLLC**
119 W. Ferguson Street
Tyler, Texas 75702
Telephone: (903) 705-7420
Facsimile: (888) 908-4400
*Pro Hac Vice Pending*
**ATTORNEYS FOR PLAINTIFF**
**BETEIRO, LLC**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **BETEIRO, LLC,** | |
| Plaintiff | Case No.  21-cv-_____ |
| v. | **JURY TRIAL DEMANDED** |
| **DRAFTKINGS, INC.,** | |
| Defendant | |

**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Beteiro, LLC ("Plaintiff") hereby files this Original Complaint for Patent Infringement against Defendant DraftKings, Inc. ("DraftKings" or "Defendant"), and alleges, upon information and belief, as follows:

## THE PARTIES

1. Beteiro, LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business at 600 S. Dixie Highway, Suite 605, West Palm Beach, Florida 33401.

2. Upon information and belief, Defendant is a domestic for-profit corporation organized and existing under the laws of the State of Delaware, with a principal place of business located at 221 River Street, Hoboken, New Jersey 07030. On information and belief, Defendant may be served through its registered agent in the State of Delaware at: National Registered Agents, Inc., 160 Greentree Drive, Suite 101, Dover, Delaware 19904.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338(a).

4. This Court has personal jurisdiction over Defendant. On information and belief, Defendant has continuous and systematic business contacts with the State of New Jersey. On information and belief, Defendant maintains physical offices and employees in the State of New Jersey, and promotes itself as being licensed by the New Jersey Division of Gaming Enforcement. Moreover, on information and belief, Defendant generates substantial revenues in this District from its infringing Mobile Wagering Platform. Indeed, the New Jersey office location is promoted by DraftKings as the headquarters for the Sportsbook Team, which is the subject of the instant action for infringement.



*See https://careers.draftkings.com/locations/.*

5.  On information and belief, DraftKings has a substantial presence in the State of New Jersey and within this District, as exemplified by the LinkedIn Profile Page for DraftKings, which indicates there are over 200 employees of DraftKings residing in the greater New York City area.



*See* DraftKings LinkedIn Profile Page, at: *https://www.linkedin.com/company/draftkings-inc-/.*

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                    3

6.     On information and belief, DraftKings provides a plurality of gambling and event wagering services, including but not limited to providing and supporting its branded Mobile Wagering Platform, which is comprised of hardware (including servers) and software (including source code).  On information and belief, such hardware and software are made, used, sold, offered for sale, and tested on the authority and under the direction of DraftKings.  Such branded Mobile Wagering Platform of DraftKings is directly accessible to users in the United States through the Internet domains and mobile applications of DraftKings.

7.     Venue is proper in the District of New Jersey as to Defendant pursuant to at least 28 U.S.C. §§ 1391(b) and (c) and 1400(b).  As noted above, Defendant maintains a regular and established business presence in this District.

## PATENTS-IN-SUIT

8.     Plaintiff is the sole and exclusive owner, by assignment, of U.S. Patent Nos. 9,965,920 ("the '920 Patent"); 10,043,341 ("the '341 Patent"); 10,147,266 ("the '266 Patent"); and 10,255,755 ("the '755 Patent") (hereinafter collectively referred to as "the Beteiro Patents").

9.     By operation of law, the Beteiro Patents were originally issued and exclusively vested to the sole named inventor, Raymond Anthony Joao, as of the date of their respective issuances.  *See* 35 U.S.C. § 261; *Schwendimann v. Arkwright Advanced Coating, Inc.,* 959 F.3d 1065, 1072 (Fed. Cir. 2020); *Suppes v. Katti,* 710 Fed. Appx. 883, 887 (Fed. Cir. 2017); *Taylor v. Taylor Made Plastics, Inc.,* 565 Fed. Appx. 888, 889 (Fed. Cir. 2014).  Mr. Joao, in a written instrument dated March 6, 2012, and filed with the United States Patent and Trademark Office on May 7, 2015 at Reel 035604 and Frames 0126-0132, assigned all rights, title, and interest in the Beteiro Patents to GTJ Ventures, LLC.  Thereafter, in a written instrument dated June 15, 2021, and filed with the United States Patent and Trademark Office on June 16, 2021 at Reel 056566 and Frames 0057-

0060, GTJ Ventures assigned all rights, title, and interest in the Beteiro Patents to the Plaintiff, Beteiro, LLC.  As such, Plaintiff Beteiro LLC has sole and exclusive standing to assert the Beteiro Patents and to bring these causes of action.

10.    The Beteiro Patents are valid, enforceable, and were duly issued in full compliance with Title 35 of the United States Code.

11.    The inventions described and claimed in the Beteiro Patents were invented individually and independently by Raymond Anthony Joao.

12.    Mr. Joao is a prolific inventor, with more than 80 issued United States Patents to his credit.  The Beteiro Patents represent substantial advancements in the gambling industry which were unconventional at the time of invention.  In fact, Mr. Joao is extremely knowledgeable in the field, having earned: (i) a Masters Degree in Sports Management from Columbia University (New York); and (ii) a Masters Degree in Global Sports Law from Instituto Superior de Derecho y Economia (Madrid, Spain).

13.    The Beteiro Patents each include numerous claims defining distinct inventions.

14.    The priority date of each of the Beteiro Patents is at least as early as May 31, 2002.  As of the priority date, the inventions as claimed were novel, non-obvious, unconventional, and non-routine. Among other things, as of the priority date, the mobile gaming industry was essentially non-existent.  The first mobile gaming venture to launch internationally did not arise until 2003 in the United Kingdom, and that in the form of an elementary interactive instant win game.  *See, e.g., https://www.gamblingcommission.gov.uk/for-the-public/National-Lottery/About-the-National-Lottery.aspx.*  The concept of geolocation restrictions on such gaming platforms was not routine as of the priority date, and did not become so until many years thereafter.  Indeed, it was not until 2006 that the Nevada Gaming Control Board first cleared the way for wireless gambling in the

United States.  Even at that time, the primary concern was over data security and identity controls, not geolocation   *See  https://www.nytimes.com/2006/05/03/technology/techspecial3/03gamble. html?smid=url-share.*

15.     As further evidence of the non-routine and unconventional nature of the solutions captured in the Beteiro Patents is the stated position of the now-leading geolocation provider in the United States that: "Historically, the notion that you could indeed draw geographical boundaries on the internet would have been laughable; such was the weakness of the original technologies and the availability of cheap and easy methods to fake your location online."  *See https://www.geocomply.com/paspa-geolocation-compliance/.*  As such, the prevailing view as of the date of invention was to avoid global positioning as a means of legal compliance.

16.     As further evidence of the stated non-routine aspects of the inventions, during prosecution of the '920 Patent, Primary Examiner Jasson Yoo specifically and expressly considered whether the claims of the '920 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*.  Examiner Yoo affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims explicitly require the use of a particular machine or processor to detect the posting of information; (ii) all claims explicitly require the use of a particular machine or processor to generate and transmit a notification message to a communication device; (iii) all claims explicitly require the use of a particular receiver for receiving a bet message including location information; and (iv) all claims explicitly require the use of a particular machine or processor to determine whether the bet is allowed or disallowed by using GPS.  *See* Notice of Allowability, dated March 16, 2018.

17.     As further evidence of the stated non-routine aspects of the inventions, during prosecution of the '341 Patent, Primary Examiner Jasson Yoo specifically and expressly considered whether the

claims of the '341 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*. Examiner Yoo affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims explicitly require the use of a particular machine or processor to detect the posting of information; (ii) all claims explicitly require the use of a particular machine or processor to generate and transmit a notification message to a communication device; (iii) all claims explicitly require the use of a particular machine or processor for receiving a bet message including location information; and (iv) all claims explicitly require the use of a particular machine or processor to determine whether the bet is allowed or disallowed by using GPS. *See* Notice of Allowability, dated June 11, 2018.

18.    As further evidence of the stated non-routine aspects of the inventions, during prosecution of the '266 Patent, Primary Examiner Jasson Yoo specifically and expressly considered whether the claims of the '266 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*. Examiner Yoo affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims explicitly require the use of a particular machine or processor to detect the posting of information; (ii) all claims explicitly require the use of a particular machine or processor to generate and transmit a notification message to a communication device; (iii) all claims explicitly require the use of a particular machine or processor for receiving a bet message including location information; and (iv) all claims explicitly require the use of a particular machine or processor to determine whether the bet is allowed or disallowed by using GPS. *See* Notice of Allowability, dated June 11, 2018.

19.    As further evidence of the stated non-routine aspects of the inventions, during prosecution of Application No. 16/939,030, Primary Examiner Jasson Yoo specifically and expressly considered whether the then-pending claims were eligible under 35 USC §101 in view of the United States

Supreme Court's decision in *Alice*. Examiner Yoo affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims integrate the invention into a practical application by providing an improvement to a technical field; (ii) all claims provide an improvement to a technical field by allowing individuals to access gaming or gambling venues and/or activities without requiring them to be physically located at gaming or gambling venues and/or activities; (iii) all claims provide individuals with information regarding the gaming or gambling venues so that bets can be placed from a remote location; (iv) all claims achieve the stated benefits by: (a) detecting a posting of information regarding a gaming activity, gambling activity or sporting event, and (b) generating a notification message regarding the gaming activity, gambling activity or sporting event; (v) in all claims a global position device is used to determine a position or location information of a communication device associated with the individual, and allowing or disallowing the activity request or bet based on the position or location information; as such, the claimed machine is required and imposes a meaningful limit on the scope of a claim and plays a significant part in permitting the claimed method to be performed; (vi) at the time the application was filed, the use of global positioning systems for various applications and providing a user a message if a posting was detected were not as well-known as today; in fact, and as indicated in the specification, prior art systems failed to provide a system that allows individuals access to particular gaming venues or gaming activities, and did not provide individuals certain information for enhancing their experience; and (vii) the claimed invention provides an improvement to online betting and therefore is integrated into a practical application. *See* Notice of Allowability, dated October 27, 2021.

20. Plaintiff alleges infringement on the part of Defendant of the '920 Patent, the '341 Patent, the '266 Patent, and the '755 Patent (collectively as the "Asserted Patents").

21.     The '920 Patent relates generally to an apparatus, including a processor, specially programmed to detect a posting of information regarding a sporting event for which a bet can be placed, which detects the posting regarding the sporting event and generates a notification message containing information regarding the sporting event.  The apparatus initiates a communication link with a first user communication device and transmits the notification message to the first user communication device via the communication link; a receiver which receives a bet message, containing information regarding a bet on or regarding the sporting event, transmitted from the first user communication device or a second user communication device; and a transmitter.  The apparatus or processor processes information for placing the bet and the transmitter transmits video information or audio information regarding, and obtained at, the sporting event to the first user communication device, the second user communication device, or a third user communication device.  *See* Abstract, '920 Patent.

22.     The '341 Patent relates generally to an apparatus, including a computer including a processor which detects a posting of information regarding a gaming activity, gambling activity, or sporting event, and generates the notification message.  The computer initiates a communication link with a first device and transmits the notification message to the first device.  The computer receives a bet message transmitted from the first device or from a second device.  The first device or second communication device includes a global positioning device and a display.  The bet message contains information regarding a bet to be placed and information regarding the position or location of the first device or second device at a time of a transmission of the bet message.  The computer determines if the bet is allowed or disallowed using position or location information of the first device or the second device.  *See* Abstract, '341 Patent.

23.     The '266 Patent relates generally to an apparatus, including a computer.  The computer detects a posting of information regarding a gaming activity, gambling activity, or sporting event, and generates a notification message.  The computer initiates a communication link with, and transmits the notification message to, a first communication device, or the computer transmits the notification message as an electronic mail message which is received by a first communication device.  The computer receives a bet message transmitted from the first communication device or a second communication device. The first communication device or second communication device includes a global positioning device which determines a position or location of the first communication device or second communication device.  The computer determines if the bet is allowed or disallowed using the position or location information.  If allowed, the computer processes information for placing the bet.  If disallowed, the computer processes information for disallowing the bet.  *See* Abstract, '266 Patent.

24.     The '755 Patent relates generally to a method and apparatus, including: detecting, with a computer, a posting of information regarding a gaming activity, gambling activity, or sporting event; generating a notification message regarding the same; initiating a communication link with, and transmitting the notification message to, a first communication device as an electronic transmission, or transmitting the notification message as an electronic mail message; receiving a bet message transmitted from the first communication device or a second communication device, wherein the first communication device or the second communication device comprises a global positioning device which determines a position or location of the first communication device or second communication device, wherein the bet message contains information regarding a bet to be placed regarding the activity or event, and information regarding the position or location of the

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                          10

first communication device or second communication device; and determining whether the bet is allowed or disallowed using the position or location information. *See* Abstract, '755 Patent.

25. As noted, the claims of the Asserted Patents have priority to at least May 31, 2002. At that time, the use of geolocation and global positioning as an integral data point in the processing of mobile wagers was still many years away. For example, the first GPS chip to be incorporated into a mobile device with sufficient sensitivity to assess the ability of an individual to place a wager in a given jurisdiction was the GL20000 GPS Chip, which was first used in the HP iPaq in 2005.

26. Still further, the current industry leader in the space – GeoComply – did not even exist until 2011, nearly a full decade later than the nominal date of invention in May 2002. *See, e.g., https://www.geocomply.com/about-us/.* This fact alone is compelling evidence of the non-routine and unconventional inventive concepts captured in the claims of the Beteiro Patents.

27. The claims of the Asserted Patents are not drawn to laws of nature, natural phenomena, or abstract ideas. Although the systems and methods claimed in the Asserted Patents are ubiquitous now (and, as a result, are widely infringed), the specific combinations of elements, as recited in the claims, were not conventional or routine at the time of the invention.

28. Further, the claims of the Asserted Patents contain inventive concepts which transform the underlying non-abstract aspects of the claims into patent-eligible subject matter.

29. Consequently, the claims of the Asserted Patents recite apparatuses and methods resulting in improved functionality of the claimed systems and represent technological improvements to the operation of computers. The claims of the Asserted Patents provide a basis for legally compliant remote wagering, increased accessibility to wagering platforms, increased opportunity for wagering providers, increased accessibility to wagering information to wagerers, reduced fraud,

and more secure transactions among wagering providers and wagerers. *See, e.g.,* '920 Patent at 2:5-7:58.

30.     The claims of the Asserted Patents overcome deficiencies existing in the art as of the date of invention, and comprise non-conventional approaches that transform the inventions as claimed into substantially more than mere abstract ideas.  For example, as of the date of invention, "[w]hile many individuals enjoy gambling and/or enjoy engaging in gaming activities and/or gambling activities, they may not always have access to particular gaming venues or gaming activities.  Further, while many individuals may also be interested in making a gaming and/or gambling experience more interesting, more challenging, and/or more exciting, they typically do not have access to certain information, products, and/or services, for enhancing their experience or experiences." '920 Patent at 1:44-52.  The inventions as claimed overcome these deficiencies in the state of the art, and provide a means by which interested parties can access gambling services remotely, while preserving geographic restrictions on such access.  As explained, as of the date of invention, "prior art gaming systems and/or gambling systems, as well as conventional gaming practices and/or gambling practices, have failed to provide the gaming community with services, products, and/or other offerings, which would provide for more enhanced gaming and/or gambling activities, environments, and/or experiences." '920 Patent at 1:53-58.

31.     As of the date of invention (and still today), different jurisdictions had different laws relating to gambling activities, but no effective way to administer and regulate electronic and online wagering.  Accordingly, the inventions as claimed provided a technological solution to the technological problems arising in the online wagering context.  As explained: "The present invention can be utilized to facilitate compliance with the various and respective state, country, and/or sovereignty, gaming laws and/or gambling laws and/or so as to facilitate any reporting of

gaming activities and/or gambling activities to the appropriate state, country, and/or sovereignty, authorities and/or so as to facilitate any payments of fees and/or taxes relating to the gaming activities and/or gambling activities." '920 Patent at 16:14-21.  Indeed, one of the express objects of the inventions as claimed was "to provide an apparatus and method for facilitating gaming activity and/or gambling activity which utilize global positioning technology in order to ascertain the jurisdiction in which or from which a bet is placed." '920 Patent at 26:14-18.  Such a solution was unconventional as of the date of invention, especially in view of the state of the art at the time, which was dependent upon in-person wagering.

32.     The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by providing a means by which gambling platform providers could more effectively market various gaming activities to wider audiences.  As explained, the inventions as claimed overcome these deficiencies by "allow[ing] a user or player to access a central processing computer and search for a gaming activity, gaming activities, a gaming event, or gaming events, in which the user or player may desire to bet or participate." '920 Patent at 32:6-10.  As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day by making it possible to expose more individuals to the various gaming options available in the market.

33.     The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by providing methods and apparatuses for providing wagering opportunities on an increased scale over traditional person-to-person live wagering.  As explained, the inventions as claimed overcome prior deficiencies in this regard because "the apparatus 100 also includes any number of user computers or user communication devices 20." '920 Patent at 35:65-67.  As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the

day because the wagering platform providers can maximize the number of wagers made without a proportional increase in overhead, wagering equipment/terminals, or employee capacity.

34. As noted, as of the date of invention (and still today), different jurisdictions had different laws relating to gambling activities, but no effective way to administer and regulate electronic and online wagering. A key problem as of the date of invention was the inability of wagering platform providers to geographically restrict access by remote participants. Accordingly, the inventions as claimed provided a technological solution to the technological problems arising in the online wagering context by unconventionally adapting the mobile devices used by wagering participants so as to create new mobile gaming machines. As explained: "[T]he user communication device 20 can also include a global positioning device 20J for determining the position or location of the user communication device 20. In a preferred embodiment, the global positioning device 20J can be utilized to determine the position or location of the user communication device 20 so as to, for example, determine a jurisdiction in which the user communication device 20 is located and/or is being utilized." '920 Patent at 44:37-44. As such, the inventions as claimed provided non-conventional solutions to the conventional problems of the day. Indeed, the very infringing scenarios in existence today were contemplated and foreseen by the inventor many years ago: "In another preferred embodiment, wherein the user communication device 20 is a wireless communication device and/or a mobile communication device (*i.e.* personal digital assistant, wireless videophone, wireless telephone, or palm-held device, etc., which can be equipped with a global positioning system (GPS) device 20J), the location of the user communication device 20 and, therefore, the location from which the gaming activity and/or gambling activity originates and/or from which it takes place can be determined by the user communication device 20 automatically transmitting position data and/or information to the respective central processing

computer 10 and/or gaming facility computer 30 at the time of the user's accessing of the respective central processing computer 10 and/or gaming facility computer 30." '920 Patent at 80:10-24. Again, this scenario was far from conventional as of the date of invention, as evidenced by the fact that the first iPhone was not introduced to the market until 2007, and the common "app-store" did not exist until 2008, many years after the date of invention. *https://en.wikipedia.org/wiki/IPhone* and *https://en.wikipedia.org/wiki/App_Store_(iOS/iPadOS)*. Moreover, as of 2002, it was effectively illegal in the United States to even wager on athletic events, much less to do so remotely. More specifically, the Professional and Amateur Sports Protection Act of 1992 was the federal law in effect from October 1992 until it was declared unconstitutional by the United States Supreme Court in May 2018. *See Murphy v. National Collegiate Athletics Association,* 138 S.Ct. 1461 (2018). In view of the prevailing and long-standing laws in the United States, the inventive concepts captured in the claims of the Beteiro Patents were plainly unconventional and non-routine.

35.     As noted, as of the date of invention (and still today), different jurisdictions had different laws relating to gambling activities, but no effective way to administer and regulate electronic and online wagering. A key problem as of the date of invention was the inability of wagering platform providers to geographically restrict access by remote participants. Accordingly, the inventions as claimed provided a technological solution to the technological problems arising in the online wagering context by creating unconventional central processing computers specially programmed to assess the legality of proposed wagers in real-time. As explained: "At step 2003, the respective central processing computer 10 and/or gaming facility computer 30 can determine if the remote gaming activity and/or gambling activity is allowed by the state having jurisdiction over the remote gaming activity and/or gambling activity. If, at step 2003, the respective central processing

computer 10 and/or gaming facility computer 30 determines that the remote gaming activity and/or gambling activity is disallowed by the identified state having jurisdiction over same, then the operation of the apparatus 100 will proceed to step 2004 and the respective central processing computer 10 and/or gaming facility computer 30 will cancel the respective bet, wager, and/or gaming activity and/or gambling activity." '920 Patent at 80:37-50.  As such, the claimed "central processing computer" does not merely comprise standard conventional hardware and software; rather, as claimed, it advances the functionality of the computer as a useful tool in the electronic processing of wagers, the prevention of illegal gambling, and providing a measure of compliance on the part of wagering platform providers.

36.     As noted above, during prosecution of each of the '920 Patent, the '341 Patent, and the '266 Patent, the Primary Patent Examiner specifically considered whether the claims at issue were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*.  In each instance, after due consideration, the Primary Patent Examiner expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims explicitly require the use of a particular machine or processor to detect the posting of information; (ii) all claims explicitly require the use of a particular machine or processor to generate and transmit a notification message to a communication device; (iii) all claims explicitly require the use of a particular machine or processor for receiving a bet message including location information; and (iv) all claims explicitly require the use of a particular machine or processor to determine whether the bet is allowed or disallowed by using GPS.  The Primary Patent Examiner was, in each instance, correct.  For these same reasons, all of the claims of the Asserted Patents are patent-eligible.

37.     The '920 Patent was examined by Primary United States Patent Examiner Jasson Yoo.  During the examination of the '920 Patent, the United States Patent Examiner searched for prior art in the

following US Classifications: CPC, A63F 13/00; A63F 9/24; G07F 17/32; G07F 17/3244; G07F 17/3237; G07F 17/3223; and G07F 17/3288.

38.   After conducting a search for prior art during the examination of the '920 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) US6104815; (ii) US6113493; (iii) US2002/0002075; (iv) US2002/0054088; (v) US2002/0098829; (vi) US6443841; (vii) US2002/0147049; (viii) US20020183105; and (ix) US6508709.

39.   After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '920 Patent to issue.  In so doing, it is presumed that Examiner Yoo used his knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Yoo has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).  In view of the foregoing, the claims of the '920 Patent are novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art.  Likewise, the claims of the '920 Patent are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiner Yoo.

40.   The '920 Patent is a pioneering patent, and has been cited as relevant prior art in over 25 subsequent United States Patent Applications, including Applications Assigned to such technology

leaders as Marketmaker Software, Ebay, Apple, WMS Gaming, Sony, Intralot, Joingo, and Metric Gaming.

41.     The '341 Patent was examined by Primary United States Patent Examiner Jasson Yoo.  During the examination of the '341 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: G07F 17/3237; G07F 17/3288; G07F 17/3223; G07F 17/3244; and G07F 17/32.

42.     After conducting a search for prior art during the examination of the '341 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) US6104815; (ii) US9965920; and (iii) 2002/0183105.

43.     After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '341 Patent to issue.  In so doing, it is presumed that Examiner Yoo used his knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Yoo has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).  In view of the foregoing, the claims of the '341 Patent are novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art.  Likewise, the claims of the '341 Patent are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiner Yoo.

44.  The '341 Patent is a pioneering patent, and has been cited as relevant prior art in over 25 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Marketmaker Software, Ebay, Apple, WMS Gaming, Sony, Intralot, Joingo, and Metric Gaming.

45.  The '266 Patent was examined by Primary United States Patent Examiner Jasson Yoo.  During the examination of the '266 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: G07F 17/3237; G07F 17/3288; G07F 17/3223; G07F 17/3244; and G07F 17/32.

46.  After conducting a search for prior art during the examination of the '266 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) US6104815; and (ii) 2002/0183105.

47.  After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '266 Patent to issue.  In so doing, it is presumed that Examiner Yoo used his knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Yoo has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).  In view of the foregoing, the claims of the '266 Patent are novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art.  Likewise, the claims of the '266 Patent are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a

person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiner Yoo.

48. The '266 Patent is a pioneering patent, and has been cited as relevant prior art in over 25 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Marketmaker Software, Ebay, Apple, WMS Gaming, Sony, Intralot, Joingo, and Metric Gaming.

49. The '755 Patent was examined by Primary United States Patent Examiner Jasson Yoo. During the examination of the '755 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: G07F 17/3237; G07F 17/3288; G07F 17/3223; G07F 17/3244; and G07F 17/32.

50. After conducting a search for prior art during the examination of the '755 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) US6106815; and (ii) 2002/0183105.

51. After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '755 Patent to issue. In so doing, it is presumed that Examiner Yoo used his knowledge of the art when examining the claims. *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014). It is further presumed that Examiner Yoo has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill. *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002). In view of the foregoing, the claims of the '755 Patent are novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art. Likewise, the claims of the '755 Patent are novel and non-obvious, including over all non-cited

contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiner Yoo.

52.    The '755 Patent is a pioneering patent, and has been cited as relevant prior art in over 25 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Marketmaker Software, Ebay, Apple, WMS Gaming, Sony, Intralot, Joingo, and Metric Gaming.

53.    The claims of the Asserted Patents were all properly issued, and are valid and enforceable for the respective terms of their statutory life through expiration, and are enforceable for purposes of seeking damages for past infringement even post-expiration. *See, e.g., Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.,* 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent is not viewed as having 'never existed.'  Much to the contrary, a patent does have value beyond its expiration date.  For example, an expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286") (internal citations omitted).

54.    The expiration dates of the Beteiro Patents are at least the following: the '920 Patent expires no earlier than May 19, 2023; the '341 Patent expires no earlier than May 19, 2023; the '266 Patent expires no earlier than May 19, 2023; and the '755 Patent expires no earlier than May 19, 2023.

## THE ACCUSED INSTRUMENTALITIES

55.    Upon information and belief, Defendant makes, sells, advertises, offers for sale, uses, or otherwise provides a plurality of gambling and event wagering services, including but not limited to providing and supporting its branded Mobile Wagering Platform, which is comprised of hardware (including servers) and software (including source code).  On information and belief, such hardware and software are made, used, sold, offered for sale, and tested on the authority and under

the direction of DraftKings. Such branded Mobile Wagering Platform of DraftKings is directly accessible to users in the United States through the Internet domains and mobile applications of DraftKings. On information and belief, the DraftKings system comprises servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of DraftKings which collectively operate as a single controlled apparatus to administer the DraftKings branded Mobile Wagering Platform in the United States. On information and belief, the DraftKings branded Mobile Wagering Platform offered by DraftKings is marketed as DraftKings Sportsbook and the associated State-Specific Domains, including but not limited to: New Jersey (sportsbook.draftkings.com/nj), New Hampshire (sportsbook.draftkings.com/nh), Connecticut (sportsbook.draftkings.com/ct), Pennsylvania (sportsbook.draftkings.com/pa), West Virginia (sportsbook.draftkings.com/wv), Virginia (sportsbook.draftkings.com/va), Tennessee (sportsbook.draftkings.com/tn), Michigan (sportsbook.draftkings.com/mi), Iowa (sportsbook.draftkings.com/ia), Illinois (sportsbook.draftkings.com/il), Indiana (sportsbook.draftkings.com/in), Wyoming (sportsbook.draftkings.com/wy), Colorado (sportsbook.draftkings.com/co), and Arizona (sportsbook.draftkings.com/az), as well as the associated Mobile Applications including DraftKings Sportsbook and Casino (the "DraftKings Domains"). Collectively, all of the foregoing comprise the "Accused Instrumentalities." *See* Figure Group A.



*See https://sportsbook.draftkings.com/help/sports-betting/where-is-sports-betting-legal?*





*See https://sportsbook.draftkings.com/leagues/football.*





## How to Place a Bet

**Quick Start: How to Place a Bet**

To place a bet, simply find the event and outcome you would like to bet on and click to add it to your bet slip. Remember, the green numbers associated with each outcome are the odds, which determine the potential payout. You can add up to 12 picks to your bet slip at any given time.

To view your bet slip, tap the center button on the app or look to the right-hand side of your screen on web. Here you can see all of the picks you have selected that are waiting to be placed.

Once in the bet slip, you can toggle between Singles, Parlays, and Round Robins (learn more click here). Enter the amount you would like to wager and you will see the potential payout calculated.

Once you confirm your picks and wager amount,  select 'PLACE BET' to lock in your bet. You will see a receipt for all of the bets you place. You can view all of your receipts and track the outcomes by visiting 'My Bets.'

*See https://sportsbook.draftkings.com/how-to-bet.*





*See https://sportsbook.draftkings.com/live?category=live-in-game&subcategory=tennis.*

**USER AGREEMENT**

DraftKings owns and operates the Website that links to these Terms of Use ("DraftKings" or the "Company"). We are pleased to offer you access to our Website and the ability to participate in our online gaming, other content, products, services, and promotions (collectively the "Services") that we may provide from our Website, subject to these Terms of Use (the "Terms of Use", or "Terms"), our privacy policy (the "Privacy Policy") available at https://sportsbook.draftkings.com/legal/nj-privacy-policy , the DraftKings Sportsbook Betting Agreement for the applicable games and promotions (the "Rules" or "Rules and Scoring"), available at https://sportsbook.draftkings.com/help/general-betting-rules/general-rules , and the DraftKings Gaming Agreement for the applicable casino games and promotions (collectively, the "Rules and Scoring"), available within the individual games. (Rules together with the Terms of Use and the Privacy Policy, the "Agreements"), The Player Disconnection Policy (subject to change from time to time) is available at https://sportsbook.draftkings.com/help/disconnect-policy.

*See https://sportsbook.draftkings.com/legal/nj-terms-of-use.*



*See https://sportsbook.draftkings.com/featured?category=live-in-game.*



*See*
*https://play.google.com/store/apps/details?id=com.draftkings.sportsbook&hl=en_US&gl=US.*

## **FIGURE GROUP A**

56.     On information and belief, the Accused Instrumentalities collect, process, and utilize location
information relative to the specific communication device (*e.g.,* the laptop computer or mobile
device) of the DraftKings interactive Internet domain and/or mobile application associated with
individual users of the DraftKings Wagering Platform.  On information and belief, acceptance and
use of such location information is a requirement imposed by DraftKings on all users of the
infringing Accused Instrumentalities in the United States.  *See* Figure Group B.

## What is GeoComply and why do I have to install it on my computer?

GeoComply is a third party location detection service provider that provides cybersecurity solutions to detect location fraud and verify a user's true digital identity. This process is required by multiple state regulators for licensed online sportsbooks and casinos.

To fully access the DraftKings Sportsbook or Casino on the web on your computer, you will need to enable location services and the GeoComply plugin must be installed and running as a service in the background. Once you have completed the registration process, you will be directed to the location detection plugin installation page. Once you have successfully installed the location detection plugin, you will be able to continue playing without interruptions.

## Why do I need to download/install the GeoComply Player Location Check plugin?

August 13, 2021 10:39

[WIP]

**Important**: The GeoComply Player Location Check plugin is only required for devices that aren't using a DraftKings mobile app or don't have built-in GPS/Bluetooth location services.

In accordance with state laws and regulations, DraftKings must ensure that you are physically located where the product you're attempting to use is permitted. Those regulations require the GeoComply Player Location Check plugin be used in order to pinpoint your physical location via your wireless internet connection.

*See https://help.draftkings.com/hc/en-us/sections/4404927472019-Geolocation-Troubleshooting.*

We are regulated by the New Jersey Division of Gaming Enforcement as an Internet gaming operator in accordance with the Casino Control Act N.J.S.A. 5:12-1 and its implementing regulations. Our games are tested by the New Jersey Division of Gaming Enforcement to provide games that are fair and operate correctly. Only customers 21 and over are permitted to play our games. If you or someone you know has a gambling problem and wants help, call **1-800-GAMBLER**. Subject to regulatory licensing requirements.

*See https://sportsbook.draftkings.com/legal/nj-terms-of-use.*

## **FIGURE GROUP B**

57.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling

laws and regulations of the jurisdictions in which the DraftKings Wagering Platform accepts

wagers, including but not limited to one or more of the following: (i) Colorado, as licensed and regulated by the Colorado Department of Revenue – Division of Gaming; (ii)  Illinois, as licensed and regulated by the Illinois Gaming Board; (iii) Indiana, as licensed and regulated by the Indiana Gaming Commission; (iv) Iowa, as licensed and regulated by the Iowa Racing and Gaming Commission; (v) Michigan, as licensed and regulated by the Michigan Gaming Control Board; (vi) New Hampshire, as licensed and regulated by the New Hampshire Lottery Commission; (vii) New Jersey, as licensed and regulated by the New Jersey Division of Gaming Enforcement; (viii) Pennsylvania, as licensed and regulated by the Pennsylvania Gaming Control Board; (ix) Tennessee, as licensed and regulated by the Tennessee Education Lottery Corporation; (x) Virginia, as licensed and regulated by the Virginia Lottery; (xi) West Virginia, as licensed and regulated by the West Virginia Lottery Commission; (xii) Montana, as licensed and regulated by the Montana Lottery; (xiii) Nevada, as licensed and regulated by the Nevada Gaming Commission; (xiv) Oregon, as licensed and regulated by the Oregon Lottery; and (xv) Rhode Island, as licensed and regulated by the Rhode Island Lottery.

58.    On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the DraftKings Wagering Platform accepts wagers, including but not limited to the United States Unlawful Internet Gambling Enforcement Act of 2006 (31 U.S.C. §§ 5361-5367).

59.    On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the DraftKings Wagering Platform accepts wagers, including but not limited to the Colorado Department of Revenue – Enforcement Division, Gaming Sports Industry Bulletin Number 3, dated April 20, 2020.

60.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the DraftKings Wagering Platform accepts wagers, including but not limited to Section 1900.1430 of Title 11, Section E, Chapter I of the Illinois Administrative Code.

61.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the DraftKings Wagering Platform accepts wagers, including but not limited to: (i) Chapter 11 of Indiana Title 68 – Indiana Gaming Commission Emergency Rule 20-448E, dated August 17, 2020; and (ii) IC 4-38-3-1 of Indiana Title 4 (Indiana Sports Wagering Statute).

62.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the DraftKings Wagering Platform accepts wagers, including but not limited to Technical Bulletin 2020-01, dated August 6, 2020, as issued by the Michigan Gaming Control Board.

63.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the DraftKings Wagering Platform accepts wagers, including but not limited to Section 287-I:7 of Title XXIV of the New Hampshire Statutes.

64.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the DraftKings Wagering Platform accepts wagers, including but not limited to Section 2(m) of New Jersey Assembly Bill 4111, dated June 4, 2018.

65.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the DraftKings Wagering Platform accepts

wagers, including but not limited to the Pennsylvania Expanded Gaming Act, as well as Section 809.07 of Title 58 of the Pennsylvania Code.

66.  On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the DraftKings Wagering Platform accepts wagers, including but not limited to Rule 15.1.7 (Q) of Chapter 15 of the Tennessee Sports Gaming Regulations, as promulgated by the Tennessee Education Lottery Corporation, as well as the TELC Technical Bulletin Issued August 24, 2020 relating thereto.

67.  On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the DraftKings Wagering Platform accepts wagers, including but not limited to Section 50.1-4034 of Title 58.1, Chapter 40, of the Virginia State Code.

68.  On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the DraftKings Wagering Platform accepts wagers, including but not limited to Section 29-22D-15 of West Virginia 2018 Senate Bill 415.

69.  On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the DraftKings Wagering Platform accepts wagers, including but not limited to Montana House Bill 725 (2019).

70.  On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the DraftKings Wagering Platform accepts wagers, including but not limited to Sections 22.140 and 22.145 of Regulation 22 of the Nevada Gaming Control Board.

71.  On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the DraftKings Wagering Platform accepts

wagers, including but not limited to Section 177-092-0025 of Chapter 177, Division 92 as promulgated by the Oregon State Lottery.

72. On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the DraftKings Wagering Platform accepts wagers, including but not limited to Sections 20.20(H) and 20.32 of the Rhode Island Lottery Rules and Regulations, dated December 2020.

## COUNT I
## Infringement of U.S. Patent No. 10,043,341

73. Plaintiff incorporates the above paragraphs by reference.

74. Defendant has been on actual notice of the '341 Patent at least as early as the date it received service of the Original Complaint in this litigation.

75. Upon information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

76. Upon information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 13 of the '341 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities. Defendant directly makes the infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom. More specifically, and on information and belief, Defendant: (i) developed and maintains the infringing DraftKings Domains; (ii) authored and owns the source code on which the DraftKings branded Mobile Wagering Platform functions; (iii) took affirmative steps to assemble and finance the hardware (including servers and/or computers with receivers, memory, processors, and transmitters) on which the Accused Instrumentalities operate; (iv) manages and controls the functionality on all such hardware, including by managing and controlling the software in use on

such hardware; (v) specifically embeds and/or requires the presence and use of global positioning devices as part of the DraftKings branded Mobile Wagering Platform; (vi) assumes ownership, credit, and responsibility for the Accused Instrumentalities by its overt branding and advertising of same; and (vii) receives substantial financial returns from the infringing operations of the Accused Instrumentalities. *See* Figure Groups A, B, and C.  Defendant further directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States.  Further, and on information and belief, Defendant has directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities.  More specifically, in order to maintain legal compliance in the United States, DraftKings is required to periodically monitor and ensure that the Accused Instrumentalities are performing as designed and intended, including but not limited to the enforcement of geographical restrictions of use.  Such testing and legal compliance necessarily requires DraftKings to make and use the Accused Instrumentalities in an infringing manner.  Still further, Defendant is a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities. *See* Figure Group A.

77.     The Accused Instrumentalities comprise an apparatus including a computer, wherein the computer is specially programmed for processing information for providing for a placement of a bet on or regarding a sporting event.  As noted above, and on information and belief, the Accused Instrumentalities collectively comprise the DraftKings branded Mobile Wagering Platform, which is comprised of hardware (including servers) and software (including source code).  Such branded Mobile Wagering Platform of DraftKings is directly accessible to users in the United States through the DraftKings Domains.  On information and belief, the DraftKings system comprises

servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of DraftKings which collectively operate as a single controlled apparatus to administer the DraftKings branded Mobile Wagering Platform in the United States.  The existence of the DraftKings branded Mobile Wagering Platform necessarily requires the presence and use of a specially programmed computer or computer system, including Internet servers.  As illustrated immediately below, such computer is specially programmed for offering, accepting, monitoring, and fulfilling wagers made by individuals on various events, including sporting events.  Such activities comprise "processing information for providing for a placement of a bet."  *See* Figure Group C.





*See https://sportsbook.draftkings.com/leagues/football.*

## Creating a Sportsbook or Casino account

If you already have a DraftKings account, you are not permitted to create a new one. Please review the one account per user policy HERE.

Federal and state laws require all legal, licensed and regulated Sportsbooks and Casinos to adhere to anti-money laundering protocols and verify identity, age, address, and Social Security Number (SSN) among other important information.

You can follow this link here: https://sportsbook.draftkings.com/auth or by clicking 'Log In' on the top of any Sportsbook page and select 'Sign Up'.

**To make a deposit for DraftKings Sportsbook on the app:**

1. Log into your DraftKings account on the app.

2. Tap **Deposit** in the top right corner.

3. **Select Amount** you'd like to deposit and **Add Payment Details**.

4. Complete the remaining steps for your deposit method.

**To make a deposit for DraftKings Sportsbook on mobile web:**

1. Navigate to DraftKings Sportsbook and **Log in**.

2. Tap **Deposit** at the top of the lobby homepage or tap the three-line **Menu** icon next to the DraftKings logo in the top left corner and tap **Deposit**.

3. **Select Amount** you'd like to deposit and **Add Payment Details**.

4. Complete the remaining steps for your deposit method.

# Where do I find my transaction history?

August 13, 2021 10:39

Your transaction history is available online, or via one of the DraftKings apps.

**Daily Fantasy**

- Mobile: Tap **profile picture** > tap **Transaction History**
- Web: https://www.draftkings.com/account/transactions

**Sportsbook**

- Mobile: Tap **profile picture** > tap **Financial Center** > tap **Statements & Transactions**
- Web: https://sportsbook.draftkings.com/myaccount/transactions

## Withdrawal tracker - overview

August 19, 2021 11:55

The withdrawal tracker allows you to quickly and easily track requested withdrawals from DraftKings. Each withdrawal has its own entry in the withdrawal tracker on your withdrawal page and includes the following details:

- Total withdrawal amount
- Withdrawal method or methods
- Date requested
- Processing time
- Status

**Note**: If you'd like to view your entire withdrawal history, please visit your transaction history and select **Withdrawal** from the **Filter Options.**

## Does DraftKings prevent commingling of funds between consumer accounts and company operating expenses?

August 13, 2021 10:39

**Your Money Isn't Our Money**

DraftKings keeps all player funds in a segregated player account which is never commingled with our operating business expenses, or any other accounts.

## Are gambling winnings reported to the IRS?

August 13, 2021 10:44

Certain Gambling winnings are generally considered ordinary income for U.S federal tax purposes, but not all wins are reported to the Internal Revenue Service. The amount reported is unique to each customer's wager and circumstances.

When the first reportable win occurs, you may be asked to complete **IRS Form W-9**. If a wager is subject to IRS reporting requirements, DraftKings will issue IRS Form W-2G, Certain Gambling Winnings, which is used to report gambling winnings, and any federal income tax withheld on those winnings. The requirements for reporting and withholding depend on the taxable reporting criteria for the type of gambling, the amount of the gambling winnings, and in some cases the ratio of the winnings to the wager.

*See https://help.draftkings.com/hc/en-us.*

### **FIGURE GROUP C**

78.     The aforementioned computer(s) of the Accused Instrumentalities include at least one receiver, which is configured to receive requests to notify individual users regarding the sporting event for which wagers can be placed. More specifically, when a user logs into or accesses the infringing DraftKings branded Mobile Wagering Platform via the DraftKings Domains, the infringing apparatus receives a set of user credentials which serve as a request to be notified of available sporting events for which wagers can be placed. On information and belief, once the user logs into or accesses the infringing DraftKings branded Mobile Wagering Platform via the DraftKings Domains, the infringing apparatus stores information regarding the request to be notified in memory. The stored information is used, *inter alia*, to assist in designating the user as "logged in" or "logged out" of an account maintained on the DraftKings branded Mobile Wagering Platform.

79.     In addition, or in the alternative, the receiver of the DraftKings branded Mobile Wagering Platform is configured such that it receives incoming HTTP requests from users accessing the DraftKings Domains via a web browser or application. Such HTTP requests initiate a dynamic and interactive session with the DraftKings branded Mobile Wagering Platform. The incoming request for information is a request to be notified regarding available sporting events for which wagers can be placed; such requests are stored and satisfied when the infringing apparatus returns page content to the user via the DraftKings branded Mobile Wagering Platform.

80.     The apparatus of the Accused Instrumentalities includes a specially programmed processor, which detects postings of information regarding sporting events for which wagers can be placed and generates notification messages regarding such sporting events. Such processor detects the posting of sporting event schedules, wager availability, wagering odds, wager popularity, sporting event scoring and statistics, sporting event results, and wager status. Upon detection, the processor of the DraftKings branded Mobile Wagering Platform delivers notification messages, which are

reflected and take the form of updated, new, or revised data displayed via the DraftKings Domains. By way of example, the infringing processor detects the posting of updated odds for specific wagers, and thereupon generates and delivers notification messages to those who have requested such notifications via the DraftKings Domains.  On information and belief, such notifications are delivered to requestors when the computer of the infringing apparatus initiates a communication link with the browser via the DraftKings Domains, which are assembled and displayed on the communication device associated with the individual user (such as, for example, the DraftKings Mobile Application on the user mobile device).  *See* Figure Groups A and C.

81.   The computer of the Accused Instrumentalities is configured to receive bet messages transmitted from the communication devices of users of the DraftKings branded Mobile Wagering Platform via the DraftKings Domains.  Indeed, this is the primary purpose and objective of the Accused Instrumentalities.  More specifically, the user interfaces of the DraftKings Domains are specially programmed such that users can select from a menu of available sporting event wagers and transmit such wager selections ("bet messages") via the Internet to the servers and processors of the DraftKings branded Mobile Wagering Platform for fulfillment.  *See* Figure Groups A and C.

82.   On information and belief, the DraftKings branded Mobile Wagering Platform requires users to provide at least one global positioning device for each communication device.  Such global positioning devices determine the physical location of such communication devices, and are essential and required by DraftKings for all users of the Accused Instrumentalities; DraftKings thus places the whole infringing apparatus into service and otherwise establishes the manner of performance of the claimed elements and/or conditions participation in the wagering opportunities upon the provision of such global positioning devices.  *See* Figure Group B.  More specifically, and on information and belief, in order to make beneficial use of the DraftKings branded Mobile

Wagering Platform, users are required to accept and download, install, enable, and/or activate global positioning software on all devices from which wagers are able to be placed.  Such software is required to be actively installed or enabled as part of the registration, log-in, or wagering process, or is otherwise embedded into the DraftKings Domains for seamless automatic installation and enablement.  In addition, and/or in the alternative, the DraftKings branded Mobile Wagering Platform processes and assesses the respective global positioning devices of each communication device by identifying the specific network routing or IP address for each such communication device, or by processing functionally similar data.

83.    On information and belief, the DraftKings branded Mobile Wagering Platform is configured such that the global positioning data of the communication device is transmitted contemporaneous with the bet message, and is otherwise contained as part of the bet message.

84.    On information and belief, the computer/processor of the DraftKings branded Mobile Wagering Platform is configured such that it processes incoming bet messages for the purpose of allowing or disallowing the wagers associated therewith.  On information and belief, as part of the regulatory compliance protocols implemented by DraftKings, the decision to either allow or disallow a given wager is determined, at least in part, upon the information regarding the global position of the communication device from which the bet message originated.  *See* Figure Group B.

85.    The foregoing infringement on the part of DraftKings has caused past and ongoing injury to Plaintiff.  The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '341 Patent.

86. To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '341 Patent, such infringement is and will be necessarily willful and deliberate.

87. Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

**COUNT II**
**Infringement of U.S. Patent No. 10,147,266**

88. Plaintiff incorporates the above paragraphs by reference.

89. Defendant has been on actual notice of the '266 Patent at least as early as the date it received service of the Original Complaint in this litigation.

90. Upon information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

91. Upon information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 1 of the '266 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities. Defendant directly makes the infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom. More specifically, and on information and belief, Defendant: (i) developed and maintains the infringing DraftKings Domains; (ii) authored and owns the source code on which the DraftKings branded Mobile Wagering Platform functions; (iii) took affirmative steps to assemble and finance the hardware (including servers and/or computers with receivers, memory, processors, and transmitters) on which the Accused Instrumentalities operate; (iv) manages and controls the functionality on all such hardware, including by managing and controlling the software in use on such hardware; (v) specifically embeds and/or requires the presence and use of global positioning devices as part of the DraftKings branded Mobile Wagering Platform; (vi) assumes ownership,

credit, and responsibility for the Accused Instrumentalities by its overt branding and advertising of same; and (vii) receives substantial financial returns from the infringing operations of the Accused Instrumentalities. *See* Figure Groups A, B, and C. Defendant further directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States. Further, and on information and belief, Defendant has directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities. More specifically, in order to maintain legal compliance in the United States, DraftKings is required to periodically monitor and ensure that the Accused Instrumentalities are performing as designed and intended, including but not limited to the enforcement of geographical restrictions of use. Such testing and legal compliance necessarily requires DraftKings to make and use the Accused Instrumentalities in an infringing manner. Still further, Defendant is a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities. *See* Figure Group A.

92.     The Accused Instrumentalities comprise an apparatus including a computer, wherein the computer is specially programmed for processing information for providing for a placement of a bet on or regarding a gaming activity, a gambling activity, or a sporting event. As noted above, and on information and belief, the Accused Instrumentalities collectively comprise the DraftKings branded Mobile Wagering Platform, which is comprised of hardware (including servers) and software (including source code). Such branded Mobile Wagering Platform of DraftKings is directly accessible to users in the United States through the DraftKings Domains. On information and belief, the DraftKings system comprises servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications

of DraftKings which collectively operate as a single controlled apparatus to administer the DraftKings branded Mobile Wagering Platform in the United States. The existence of the DraftKings branded Mobile Wagering Platform necessarily requires the presence and use of a specially programmed computer or computer system, including Internet servers. As illustrated in Figure Group C, such computer is specially programmed for offering, accepting, monitoring, and fulfilling wagers made by individuals on various events, including sporting events. Such activities comprise "processing information for providing for a placement of a bet on or regarding a gaming activity, a gambling activity, or a sporting event." *See* Figure Group C.

93. The apparatus of the Accused Instrumentalities includes a specially programmed processor, which detects postings of information regarding gaming activities, gambling activities, and/or sporting events for which wagers can be placed and generates notification messages regarding such sporting events and/or activities. Such processor detects the posting of sporting event schedules, wager availability, wagering odds, wager popularity, sporting event scoring and statistics, sporting event results, and wager status. Upon detection, the processor of the DraftKings branded Mobile Wagering Platform delivers notification messages, which are reflected and take the form of updated, new, or revised data displayed via the DraftKings Domains. By way of example, the infringing processor detects the posting of updated odds for specific wagers, and thereupon generates and delivers notification messages via the DraftKings Domains. On information and belief, such notifications are delivered to requestors when the computer of the infringing apparatus initiates a communication link with the browser via the DraftKings Domains ("electronic transmission"), which are received, assembled, and displayed on the communication device associated with the individual user (such as, for example, the DraftKings Mobile Application on the user mobile device). *See* Figure Groups A and C.

94.     The computer of the Accused Instrumentalities is configured to receive bet messages transmitted from the communication devices of users of the DraftKings branded Mobile Wagering Platform via the DraftKings Domains.  Indeed, this is the primary purpose and objective of the Accused Instrumentalities.  More specifically, the user interfaces of the DraftKings Domains are specially programmed such that users can select from a menu of available sporting event wagers and transmit such wager selections ("bet messages") via the Internet to the servers and processors of the DraftKings branded Mobile Wagering Platform for fulfillment.  *See* Figure Groups A and C.

95.     On information and belief, the DraftKings branded Mobile Wagering Platform requires users to provide at least one global positioning device for each communication device.  Such global positioning devices determine the physical location of such communication devices, and are essential and required by DraftKings for all users of the Accused Instrumentalities; DraftKings thus places the whole infringing apparatus into service and otherwise establishes the manner of performance of the claimed elements and/or conditions participation in the wagering opportunities upon the provision of such global positioning devices.  *See* Figure Group B.  More specifically, and on information and belief, in order to make beneficial use of the DraftKings branded Mobile Wagering Platform, users are required to accept and download, install, enable, and/or activate global positioning software on all devices from which wagers are able to be placed.  Such software is required to be actively installed or enabled as part of the registration, log-in, or wagering process, or is otherwise embedded into the DraftKings Domains for seamless automatic installation and enablement.  In addition, and/or in the alternative, the DraftKings branded Mobile Wagering Platform processes and assesses the respective global positioning devices of each communication device by identifying the specific network routing or IP address for each such communication device, or by processing functionally similar data.

96.     On information and belief, the DraftKings branded Mobile Wagering Platform is configured such that the global positioning data of the communication device is transmitted contemporaneous with the bet message, and is otherwise contained as part of the bet message.

97.     On information and belief, the computer/processor of the DraftKings branded Mobile Wagering Platform is configured such that it processes incoming bet messages for the purpose of allowing or disallowing the wagers associated therewith.  On information and belief, as part of the regulatory compliance protocols implemented by DraftKings, the decision to either allow or disallow a given wager is determined, at least in part, upon the information regarding the global position of the communication device from which the bet message originated.  *See* Figure Group B.

98.     The foregoing infringement on the part of DraftKings has caused past and ongoing injury to Plaintiff.  The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '266 Patent.

99.     To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '266 Patent, such infringement is and will be necessarily willful and deliberate.

100.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

## COUNT III
## Infringement of U.S. Patent No. 10,255,755

101.    Plaintiff incorporates the above paragraphs by reference.

102.    Defendant has been on actual notice of the '755 Patent at least as early as the date it received service of the Original Complaint in this litigation.

103.    Upon information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

104. Upon information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 2 of the '755 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities. Defendant directly makes the infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom. More specifically, and on information and belief, Defendant: (i) developed and maintains the infringing DraftKings Domains; (ii) authored and owns the source code on which the DraftKings branded Mobile Wagering Platform functions; (iii) took affirmative steps to assemble and finance the hardware (including servers and/or computers with receivers, memory, processors, and transmitters) on which the Accused Instrumentalities operate; (iv) manages and controls the functionality on all such hardware, including by managing and controlling the software in use on such hardware; (v) specifically embeds and/or requires the presence and use of global positioning devices as part of the DraftKings branded Mobile Wagering Platform; (vi) assumes ownership, credit, and responsibility for the Accused Instrumentalities by its overt branding and advertising of same; and (vii) receives substantial financial returns from the infringing operations of the Accused Instrumentalities. *See* Figure Groups A, B, and C. Defendant further directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States. Further, and on information and belief, Defendant has directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities. More specifically, in order to maintain legal compliance in the United States, DraftKings is required to periodically monitor and ensure that the Accused Instrumentalities are performing as designed and intended, including but not limited to the enforcement of geographical restrictions of use. Such

testing and legal compliance necessarily requires DraftKings to make and use the Accused Instrumentalities in an infringing manner.  Still further, Defendant is a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities.  *See* Figure Group A.

105.    The Accused Instrumentalities comprise an apparatus including a computer, wherein the computer is specially programmed to perform the function of processing information for providing for a placement of a bet on or regarding a gaming activity, a gambling activity, or a sporting event.  As noted above, and on information and belief, the Accused Instrumentalities collectively comprise the DraftKings branded Mobile Wagering Platform, which is comprised of hardware (including servers) and software (including source code).  Such branded Mobile Wagering Platform of DraftKings is directly accessible to users in the United States through the DraftKings Domains. On information and belief, the DraftKings system comprises servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of DraftKings which collectively operate as a single controlled apparatus to administer the DraftKings branded Mobile Wagering Platform in the United States.  The existence of the DraftKings branded Mobile Wagering Platform necessarily requires the presence and use of a specially programmed computer or computer system, including Internet servers.  As illustrated in Figure Group C, such computer is specially programmed for offering, accepting, monitoring, and fulfilling wagers made by individuals on various events, including sporting events.  Such activities comprise a specially programmed computer for "processing information for providing for a placement of a bet on or regarding a gaming activity, a gambling activity, or a sporting event, a posting of information regarding the gaming activity, the gambling activity, or the sporting event."

106.    The apparatus of the Accused Instrumentalities includes a specially programmed processor, which is configured such that it detects and processes postings of information regarding gaming activities, gambling activities, and/or sporting events for which wagers can be placed and generates notification messages (with or using a computer) regarding such sporting events and/or activities. More specifically, such processor is specially configured such that it detects the posting of sporting event schedules, wager availability, wagering odds, wager popularity, sporting event scoring and statistics, sporting event results, and wager status.  Upon detection, the processor of the DraftKings branded Mobile Wagering Platform is specially programmed such that it delivers and transmits notification messages, which are reflected and take the form of updated, new, or revised data displayed via the DraftKings Domains.  By way of example, the infringing processor is programmed such that it detects the posting of updated odds for specific wagers, and thereupon generates and transmits notification messages via the DraftKings Domains.  On information and belief, such notifications are programmed to be transmitted and delivered to requestors when the computer of the infringing apparatus initiates a communication link with the browser via the DraftKings Domains ("electronic transmission"), which are programmed to be received, assembled, and displayed on the communication device associated with the individual user (such as, for example, the DraftKings Mobile Application on the user mobile device).  *See* Figure Groups A and C.

107.    The computer of the Accused Instrumentalities is specially programmed such that it receives bet messages transmitted from the communication devices of users of the DraftKings branded Mobile Wagering Platform via the DraftKings Domains.  Indeed, this is the primary purpose and objective of the Accused Instrumentalities.  More specifically, the user interfaces of the DraftKings Domains are specially programmed such that users can select from a menu of available sporting event

wagers and transmit such wager selections ("bet messages") via the Internet to the servers and processors of the DraftKings branded Mobile Wagering Platform for fulfillment. *See* Figure Groups A and C.

108.    On information and belief, the DraftKings branded Mobile Wagering Platform is specially programmed such that it requires users to provide at least one global positioning device for each communication device. Such global positioning devices determine the physical location of such communication devices, and are essential and required by DraftKings for all users of the Accused Instrumentalities; DraftKings thus places the whole infringing apparatus into service and otherwise establishes the manner of performance of the claimed elements and/or conditions participation in the wagering opportunities upon the provision of such global positioning devices. *See* Figure Group B. More specifically, and on information and belief, in order to make beneficial use of the DraftKings branded Mobile Wagering Platform, users are required to accept and download, install, enable, and/or activate global positioning software on all devices from which wagers are able to be placed. Such software is required to be actively installed or enabled as part of the registration, log-in, or wagering process, or is otherwise embedded into the DraftKings Domains for seamless automatic installation and enablement. In addition, and/or in the alternative, the DraftKings branded Mobile Wagering Platform is specially programmed such that it processes and assesses the respective global positioning devices of each communication device by identifying the specific network routing or IP address for each such communication device, or by processing functionally similar data.

109.    On information and belief, the DraftKings branded Mobile Wagering Platform is specially programmed such that the global positioning data of the communication device is transmitted contemporaneous with the bet message, and is otherwise contained as part of the bet message.

110.    On information and belief, the computer/processor of the DraftKings branded Mobile Wagering Platform is specially programmed such that it processes incoming bet messages for the purpose of allowing or disallowing the wagers associated therewith.  On information and belief, as part of the regulatory compliance protocols implemented by DraftKings, the decision to either allow or disallow a given wager is determined, at least in part, upon the information regarding the global position of the communication device from which the bet message originated.  *See* Figure Group B.

111.    The foregoing infringement on the part of DraftKings has caused past and ongoing injury to Plaintiff.  The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '755 Patent.

112.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '755 Patent, such infringement is and will be necessarily willful and deliberate.

113.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

### COUNT IV
### Infringement of U.S. Patent No. 9,965,920

114.    Plaintiff incorporates the above paragraphs by reference.

115.    Defendant has been on actual notice of the '920 Patent at least as early as the date it received service of the Original Complaint in this litigation.

116.    Upon information and belief, Defendant owns and controls the operation of the Accused Instrumentalities and generates substantial financial revenues therefrom.

117.    Upon information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 16 of the '920 Patent by making, using, importing, selling, and/or, offering for sale

the Accused Instrumentalities. Defendant directly makes the infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing system into service by directing and/or controlling the system as a whole and by obtaining the benefits therefrom. More specifically, and on information and belief, Defendant: (i) developed and maintains the infringing DraftKings Domains; (ii) authored and owns the source code on which the DraftKings branded Mobile Wagering Platform functions; (iii) took affirmative steps to assemble and finance the hardware (including servers and/or computers with receivers, memory, processors, and transmitters) on which the Accused Instrumentalities operate; (iv) manages and controls the functionality on all such hardware, including by managing and controlling the software in use on such hardware; (v) specifically embeds and/or requires the presence and use of global positioning devices as part of the DraftKings branded Mobile Wagering Platform; (vi) assumes ownership, credit, and responsibility for the Accused Instrumentalities by its overt branding and advertising of same; and (vii) receives substantial financial returns from the infringing operations of the Accused Instrumentalities. *See* Figure Groups A, B, and C. Defendant further directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them collectively available in the United States. Further, and on information and belief, Defendant has directly infringed by using the infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities. More specifically, in order to maintain legal compliance in the United States, DraftKings is required to periodically monitor and ensure that the Accused Instrumentalities are performing as designed and intended, including but not limited to the enforcement of geographical restrictions of use. Such testing and legal compliance necessarily requires DraftKings to make and use the Accused Instrumentalities in an infringing manner. Still further, Defendant is a direct infringer by virtue of

its branding and marketing activities which collectively comprise the sale and offering for sale of the infringing Accused Instrumentalities. *See* Figure Group A.

118. The Accused Instrumentalities comprise an apparatus including a computer, wherein the computer is specially programmed for processing information for providing for a placement of a bet on or regarding a sporting event. As noted above, and on information and belief, the Accused Instrumentalities collectively comprise the DraftKings branded Mobile Wagering Platform, which is comprised of hardware (including servers) and software (including source code). Such branded Mobile Wagering Platform of DraftKings is directly accessible to users in the United States through the DraftKings Domains. On information and belief, the DraftKings system comprises servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of DraftKings which collectively operate as a single controlled apparatus to administer the DraftKings branded Mobile Wagering Platform in the United States. The existence of the DraftKings branded Mobile Wagering Platform necessarily requires the presence and use of a specially programmed computer or computer system, including Internet servers. As illustrated in Figure Group C, such computer is specially programmed for offering, accepting, monitoring, and fulfilling wagers made by individuals on various events, including sporting events.

119. The apparatus of the Accused Instrumentalities includes a specially programmed processor, which detects postings of information regarding sporting events for which wagers can be placed via the Internet, and generates notification messages regarding such sporting events. More specifically, such processor is specially programmed such that it detects the posting of sporting event schedules, wager availability, wagering odds, wager popularity, sporting event scoring and statistics, sporting event results, and wager status. Upon detection, the processor of the DraftKings branded Mobile

Wagering Platform is specially programmed such that it transmits and delivers notification messages, which are reflected and take the form of updated, new, or revised data displayed via the DraftKings Domains.  By way of example, the infringing processor is specially programmed such that it detects the posting of updated odds for specific wagers, and thereupon generates and delivers notification messages via the DraftKings Domains.  On information and belief, such notifications are delivered to requestors when the computer of the infringing apparatus initiates a communication link with the browser via the DraftKings Domains, which are received, assembled, and displayed on the communication device associated with the individual user (such as, for example, the DraftKings Mobile Application on the user mobile device).  *See* Figure Groups A and C.

120.  The computer of the Accused Instrumentalities is specially configured to receive bet messages transmitted from the communication devices of users of the DraftKings branded Mobile Wagering Platform via the DraftKings Domains.  Indeed, this is the primary purpose and objective of the Accused Instrumentalities.  More specifically, the user interfaces of the DraftKings Domains are specially programmed such that users can select from a menu of available sporting event wagers and transmit such wager selections ("bet messages") via the Internet to the servers and processors of the DraftKings branded Mobile Wagering Platform for fulfillment.  *See* Figure Groups A and C.

121.  On information and belief, the DraftKings branded Mobile Wagering Platform requires users to provide at least one global positioning device for each communication device.  Such global positioning devices determine the physical location of such communication devices, and are essential and required by DraftKings for all users of the Accused Instrumentalities; DraftKings thus places the whole infringing apparatus into service and otherwise establishes the manner of

performance of the claimed elements and/or conditions participation in the wagering opportunities upon the provision of such global positioning devices. *See* Figure Group B. More specifically, and on information and belief, in order to make beneficial use of the DraftKings branded Mobile Wagering Platform, users are required to accept and download, install, enable, and/or activate global positioning software on all devices from which wagers are able to be placed. Such software is required to be actively installed or enabled as part of the registration, log-in, or wagering process, or is otherwise embedded into the DraftKings Domains for seamless automatic installation and enablement. In addition, and/or in the alternative, the DraftKings branded Mobile Wagering Platform processes and assesses the respective global positioning devices of each communication device by identifying the specific network routing or IP address for each such communication device, or by processing functionally similar data.

122. On information and belief, the DraftKings branded Mobile Wagering Platform is configured such that the global positioning data of the communication device is transmitted contemporaneous with the bet message, and is otherwise contained as part of the bet message.

123. On information and belief, the computer/processor of the DraftKings branded Mobile Wagering Platform is configured such that it processes incoming bet messages for the purpose of allowing or disallowing the wagers associated therewith. On information and belief, as part of the regulatory compliance protocols implemented by DraftKings, the decision to either allow or disallow a given wager is determined, at least in part, upon the information regarding the global position of the communication device from which the bet message originated. *See* Figure Group B.

124. On information and belief, the Accused Instrumentalities further comprise video recording and/or video conferencing devices which are configured to obtain and/or record live video information regarding the sporting events for which wagers can be placed. The Accused Instrumentalities

further comprise transmitters, which are programmed so as to transmit such video information to users of the infringing system via the DraftKings Domains. On information and belief, such video information is transmitted and delivered to users when the computer of the infringing apparatus initiates a communication link with the browser via the DraftKings Domains, which are received, assembled, and displayed on the communication device associated with the individual user (such as, for example, the DraftKings Mobile Application on the user mobile device) in the form of real-time game status and odds updates. *See* Figure Groups A, C, and D.





*See https://sportsbook.draftkings.com/live?category=live-in-game&subcategory=tennis.*

**FIGURE GROUP D**

125.    The foregoing infringement on the part of DraftKings has caused past and ongoing injury to Plaintiff.  The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '920 Patent.

126.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '920 Patent, such infringement is and will be necessarily willful and deliberate.

127.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Beteiro, LLC respectfully requests the Court enter judgment against Defendant as follows:

1.      Declaring that Defendant has infringed each of the Asserted Patents;

2.      Awarding Beteiro, LLC its damages suffered because of Defendant's infringement of the Asserted Patents;

3.      Awarding Beteiro, LLC its costs, reasonable attorneys' fees, expenses, and interest;

4.      Granting a permanent injunction pursuant to 35 U.S.C. § 283, enjoining Defendants from further acts of infringement with respect to the Asserted Patents;

5.      Awarding Beteiro, LLC ongoing post-trial royalties for infringement of the non-expired Asserted Patents; and

6.      Granting Beteiro, LLC such further relief as the Court finds appropriate.

## JURY DEMAND

Beteiro, LLC demands trial by jury, under Fed. R. Civ. P. 38.

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, Plaintiff states that, to its knowledge, the matter in controversy in this action is not the subject of any other action in any court, or any pending arbitration or administrative proceeding, except the following matters pending in the Western District of Texas: *Beteiro, LLC v. PlayUp Ltd*; 6:21-cv-1150; *Beteiro, LLC v. Morris Mohawk*; 6:21-cv-1149; *Beteiro, LLC v. Kindred Group*; 6:21-cv-1148; *Beteiro, LLC v. Elys Game Tech*.; 6:21-cv-1147; and *Beteiro, LLC v. Flutter Entertainment*; 6:21-cv-1162.

Dated:  November 22, 2021                    Respectfully Submitted

*/s/ David A. Ward*

David A. Ward
   New Jersey Bar No. 042381996
   dward@klugerhealey.com
**KLUGER HEALEY, LLC**
521 Newman Springs Road, Suite 23
Lincroft, NJ  07738
Telephone:  (973) 307-0800
Facsimile: (888) 635-1653

M. Scott Fuller
   Texas Bar No. 24036607
   Georgia Bar No. 100968
   sfuller@ghiplaw.com
Randall Garteiser
   Texas Bar No. 24038912
   California Bar No. 239829
   rgarteiser@ghiplaw.com

**GARTEISER HONEA, PLLC**
119 W. Ferguson Street
Tyler, Texas 75702
Telephone: (903) 705-7420
Facsimile: (888) 908-4400
*Pro Hac Vice Pending*
**ATTORNEYS FOR PLAINTIFF
BETEIRO, LLC**